Jamie CARR, Petitioner,

v.

Brian FISCHER, Respondent.

No. 01–CV–6878.

United States District Court,
E.D. New York.

Sept. 9, 2003.

Jamie Carr, pro se.

Merri Turk Lasky, for defendant.

## ORDER

GERSHON, District Judge.

The unopposed report and recommendation of the Honorable Cheryl L. Pollak, Magistrate Judge, dated August 6, 2003, which recommends that this petition for a writ of habeas corpus be denied is adopted. Judge Pollak found that the claims were unexhausted but, wisely, given the closeness of the issue of exhaustion as to at least some of the claims, went on to consider both procedural bar and the merits of each claim. Her analysis of these issues is comprehensive and sound, and it is adopted by the court.

The petition for a writ of habeas corpus is denied. As petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability is denied.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

POLLACK, United States Magistrate Judge.

On March 3, 1998, petitioner Jamie Carr was convicted and sentenced to an indeterminate prison term of from twelve and one-half to twenty-five years for manslaughter and a concurrent term of one year for possession of a weapon. On October 16, 2001, petitioner, proceeding *pro se*, filed a writ of *habeas corpus*, pursuant to 28 U.S.C. § 2254, alleging three grounds: (1) the trial court erred in failing to give a curative instruction or strike from the record certain testimony elicited by the State on cross-examination of petitioner, which was the subject of an objection by defense counsel that was sustained by the court;

(2) the evidence presented was legally insufficient to sustain the verdict; and (3) petitioner was deprived of a fair trial and due process when the trial court admitted into evidence two 911 tapes which served to improperly bolster the State's evidence.

By Order dated March 6, 2003, the petition was referred to the undersigned to prepare a Report and Recommendation.

## PROCEDURAL HISTORY

On August 13, 1996, in the early morning, petitioner Jamie Carr was ejected from O'Hanlon's Bar after becoming loud and belligerent. (Lasky Aff. ¶ 4).[1] Francis White, another patron of the Bar, left the Bar a few minutes after petitioner. (*Id.*) The State alleged that petitioner attacked White with a knife, stabbing him twelve times and causing his death. (*Id.*)

Petitioner was charged with two counts of Murder in the Second Degree, in violation of New York Penal Law § 125.25[1][2], and Criminal Possession of a Weapon in the Fourth Degree, in violation of New York Penal Law § 265.01[2]. (*Id.* ¶ 5). Following a trial before the Honorable Seymour Katz, Justice of the Supreme Court, Queens County, the jury rendered a verdict convicting petitioner of the lesser included offense of Manslaughter in the First Degree, in violation of New York Penal Law § 125.20[1]. (*Id.* ¶ 6). He was also convicted of Criminal Possession of a Weapon in the Fourth Degree, in violation of New York Penal Law § 265.01[2]. (*Id.*)

Petitioner was sentenced on March 3, 1998 to twelve and one-half to twenty-five years for the manslaughter charge and a

---

**1.** Citations to "Lasky Aff." refer to paragraphs in the Affidavit of Assistant District Attorney Merri Turk Lasky, dated December 17, 2001, and submitted in Opposition to the Petition for a Writ of *Habeas Corpus*. Citations to "Tr. at" refer to pages in the transcript of the trial proceedings before the Honorable Stanley B. Katz, beginning on February 3, 1998.

concurrent one year term for the weapons charge. (*Id.*)

On that same day, March 3, 1998, petitioner filed a Notice of Appeal to the Appellate Division, Second Department, raising four claims of error: (1) he was denied due process by the improper admission into evidence of two 911 tapes; (2) the trial court committed error when it allowed the State to elicit testimony from petitioner that he had checked into a motel following the stabbing and in failing to strike the question and answer or, in the alternative, give a curative instruction to the jury; (3) the evidence presented at trial was insufficient to prove guilt beyond a reasonable doubt and the verdict was against the weight of the evidence; and (4) the sentence was harsh and excessive. (*Id.* ¶¶ 7–8).

On November 6, 2000, the Appellate Division affirmed the judgment of conviction. *People v. Carr,* 277 A.D.2d 246, 716 N.Y.S.2d 59 (2d Dep't 2000). With respect to the first claim of error, the appellate court held that the first 911 tape was properly admitted under the present sense impression exception to the hearsay rule, and the second tape was properly admitted as an excited utterance. 277 A.D.2d at 247, 716 N.Y.S.2d at 59. With respect to petitioner's claim as to the sufficiency of the evidence, the appellate court held that petitioner had failed to preserve the issue for appellate review, and that, in any event, the evidence, viewed in the light most favorable to the State, was legally sufficient and the verdict was not against the weight of the evidence. 277 A.D.2d at 247, 716 N.Y.S.2d at 60. Finally, as to the two remaining claims, the Appellate Divi-

sion found that they were either unpreserved for review or without merit. (*Id.*)

Leave to appeal to the New York Court of Appeals was denied on January 19, 2001. *People v. Carr,* 96 N.Y.2d 733, 745 N.E.2d 1022, 722 N.Y.S.2d 799 (2001).

This petition for a writ of *habeas corpus* was thereafter filed on October 16, 2001.

### TRIAL TESTIMONY

At the trial, the State presented the testimony of six witnesses: Sean O'Hanlon, Tom Shannon, Charles Hamill, Michael Knatz, Police Officer John Reilly, and Dr. Adalaid Charlot. Petitioner called three detectives with the New York City Police Department ("NYPD"), Richard Arbacas, Victoria Garcia, and Devora Sconiers, and petitioner testified in his own defense.

The first witness, Sean O'Hanlon, the owner of O'Hanlon's Bar and Grill ("O'Hanlon's" or the "Bar"), located at 118–12 Queens Boulevard in Forest Hills, testified that on a Monday night, early Tuesday morning, in the summer of 1996,[2] he was in O'Hanlon's Bar playing darts in preparation for a dart tournament which was scheduled for later that day. (Tr. at 97, 109). Playing darts with O'Hanlon that evening were his teammates, Michael Knatz, Jose Suarez, and a customer, Javier. (*Id.* at 111–112). Tom Shannon, who had been employed at the Bar for approximately two years, was working as the bartender that night. (*Id.* at 111, 264). Also in the Bar at the time of the incident was the victim, Francis White, who had been a customer at O'Hanlon's for approximately two years, and his friends, Charlie, and Frank.[3] (*Id.* at 113–114, 270).

---

2. The witness could not recall the exact date. (Tr. at 109).

3. This witness did not know the last names of Charlie or Frank, but it appears from the trial record that he was referring to Charlie Hamill and Frank McCauley. (*Id.* at 114).

According to Mr. O'Hanlon, the petitioner entered the Bar at approximately midnight that evening, and "he looked like he was pretty loaded already." (*Id.* at 115). O'Hanlon was playing darts at the time; Francis White and his two friends were sitting at the bar drinking. (*Id.* at 116, 270). Petitioner walked up to the bartender and asked for two Heinekens to go. (*Id.* at 117). Mr. Shannon, the bartender, confirmed Hanlon's testimony that petitioner entered the Bar at approximately 11:30 p.m. that night and told Shannon to put three or four Heinekens in a bag to go. (*Id.* at 271). Shannon told petitioner that he could not serve petitioner because petitioner had had too much to drink and "besides, we don't sell beer to go." (*Id.* at 118, 272). According to O'Hanlon, petitioner in response, said, "fuck you" to the bartender and then left the Bar. (*Id.* at 119, 272). Shannon described petitioner as "very jittery," "his hands were going all over the place, he was kind of bouncing back and forth ... his eyes didn't look right," "like he was high on something." (*Id.* at 274). According to Shannon, "he was very aggressive," "shouting all the time." (*Id.*)

Approximately three to four minutes later,[4] petitioner returned to the Bar, walked up to the bartender, threw down a hundred dollar bill on the bar, and said, "break this fucking bill and take $5 for yourself." (*Id.* at 120). When the bartender told petitioner that he did not break hundred dollar bills, petitioner "got angrier." (*Id.* at 121). According to O'Hanlon, petitioner "started screaming, 'what the fuck is wrong with you people in here,'" looking at everyone in the Bar and yelling in a loud voice. (*Id.* at 122). Shannon confirmed that he told the petitioner

that he would not change the bill and at that point, according to Shannon, petitioner started "cursing [Shannon] out;" "[h]e was shouting, he was going nuts." (*Id.* at 277).

O'Hanlon then walked up to petitioner and asked him to leave, telling petitioner that he was the owner, that petitioner was not going to be served, and that petitioner should leave. (*Id.* at 122–23, 278). Petitioner cursed at O'Hanlon. (*Id.* at 123–24). According to Shannon, petitioner then hit O'Hanlon in the face, at which point Shannon ran around the end of the bar to help. (*Id.* at 281–82). A struggle ensued and eventually, O'Hanlon and Shannon lifted petitioner up and dragged him out the door, after which point they locked the door. (*Id.* at 126–29, 285–87). According to O'Hanlon, the victim and his three friends did not punch or kick or do anything to petitioner while he was in the Bar. (*Id.* at 141).

After they threw petitioner out of the Bar, O'Hanlon locked the door and heard petitioner yell that he was not "finished with this, I'm coming back, I'm not done with this." (*Id.* at 130). O'Hanlon noticed that during the scuffle, petitioner had lost one of his sneakers, so O'Hanlon threw it out and locked the door again. (*Id.* at 131–32). One of the other customers pointed out petitioner's wallet which had also fallen out during the struggle. (*Id.* at 132–34).

Shannon testified that he stayed by the big front window where he saw petitioner get into his car and start driving like he was going to drive into the door of the Bar. (*Id.* at 290, 292). O'Hanlon testified that after throwing out the sneaker, he immediately went to the phone to call 911

---

**4.** Shannon testified that it was approximately 20 to 25 minutes later that petitioner returned to the bar, threw a hundred dollars at Shannon and told him to change it, and to keep ten or twenty. (*Id.* at 275).

because he could see from the window that petitioner had gotten into his car and was trying to back it up over the sidewalk into the front of the Bar. (*Id.* at 134, 142, 43, 292). He told the 911 operator that he needed the police because "there's some guy with his car trying to drive through the front of my store." (*Id.* at 149–50). The State offered into evidence the tape of the 911 call made by O'Hanlon. (*Id.* at 150). After counsel for petitioner stated: "I have no objection now to it being introduced into evidence," the tape was played for the jury. (*Id.* at 150–51).

Following the phone call to the police, O'Hanlon ran around the bar to grab the night stick that he had kept there since the Bar opened four and a half years earlier. (*Id.* at 152). He put the night stick on top of the bar close to where the door is and then went back to the front window to see where petitioner was. (*Id.* at 152–155). At that time, O'Hanlon saw petitioner get out of his car and walk next door into Kinkos. (*Id.* at 156). According to Shannon, Francis White and Javier left the Bar at some point after petitioner had been evicted. (*Id.* at 294). Although O'Hanlon did not see when White left the Bar, he did see petitioner in the street, arguing with Francis White. (*Id.* at 158).

According to O'Hanlon, petitioner was double parked, banging his hands on the hood of his car, and waving his hands up and down. (*Id.* at 159). Shannon also observed petitioner yelling at White, banging on the top of his car. (*Id.* at 297–98). Both O'Hanlon and Shannon testified that they saw petitioner reach into the driver's side of his car and then start walking around the car toward White. (*Id.* at 160–61, 299). The next thing O'Hanlon saw was petitioner reaching up and stabbing White in the neck three times with a knife. (*Id.* at 161–62). According to O'Hanlon, White did not do anything before he was stabbed; he was not armed; he just put up his hands. (*Id.* at 161). Shannon testified that White had his hands up over his head, trying to defend himself. (*Id.* at 299–300).

O'Hanlon then called 911 again and told the operator that one of his customers was getting stabbed outside. (*Id.* at 163). The tape of that second call was then played for the jury. (*Id.* at 163–64).

While O'Hanlon was on the phone, Charlie Hamill grabbed the night stick off the bar and ran outside where he hit petitioner with it. (*Id.* at 164–66, 302–03). Petitioner then backed off, got into his car, and took off. (*Id.* at 166–67, 303). O'Hanlon testified that White then fell to the ground where he was "bleeding a lot." (*Id.* at 168). Shannon then called 911 on the pay phone behind the bar. (*Id.* at 304–05). The police and ambulance arrived a few minutes after O'Hanlon's second 911 call and took White from the scene. (*Id.* at 169). O'Hanlon gave the police the wallet that petitioner had dropped during the struggle. (*Id.* at 169–70). Before giving the wallet to the police, O'Hanlon had noticed that the wallet contained a Florida driver's license with petitioner's photograph. (*Id.* at 169).

Charles Hamill testified that Francis was his roommate, and that during the summer of 1996, both were employed as bartenders at different locations. (*Id.* at 372–73). At approximately twelve o'clock, on the night of the incident, Hamill and White left their friend Egor's house where they had been painting and wallpapering and the three of them walked to O'Hanlons' Bar. (*Id.* at 374–76). At O'Hanlon's, they saw Frank McCauley, a friend of Hamill's. (*Id.* at 376). In addition to Hamill and his friends, there were approximately half a dozen other people in the Bar that night. (*Id.* at 377).

Hamill testified that approximately 30 to 35 minutes after he arrived at the Bar, he

observed petitioner enter the Bar looking to buy two bottles of beer to go. (*Id.* at 379–80). According to Hamill, petitioner was "hyper" and his voice was raised even though it was "a very quiet bar." (*Id.* at 382). Hamill testified that after the bartender refused to serve petitioner, petitioner left the Bar, only to return 10 to 15 minutes later. (*Id.* at 382–83). Neither Hamill, White nor any of their friends left the bar during that time. (*Id.* at 383).

When petitioner returned, he asked for change of a hundred dollar bill, but Shannon told petitioner that he could not break the hundred. (*Id..* at 384). There was then a struggle that ensued between O'Hanlon and petitioner, but, according to Hamill, neither he nor White got involved; they were just sitting at the bar watching. (*Id.* at 387–88). Hamill observed the bartender, Shannon, come around from behind the bar and help O'Hanlon lift petitioner up and out the door. (*Id.* at 388).

After petitioner left the bar, Hamill continued to have a conversation with Francis White and with Frank McCauley; he did not see O'Hanlon on the phone, nor did he look outside. (*Id.* at 392–93). At approximately 1:45 a.m., White left the Bar by himself. (*Id.* at 393). According to Hamill, White looked tired; "his eyelids were beginning to close." (*Id.* at 394).

After White left, Hamill turned around to look out the window and became aware that petitioner was outside standing beside his car, banging his hands on the car. (*Id.* at 395–97). Hamill then saw petitioner gesture and saw his lips moving, but he could not hear what petitioner was saying nor could he see White at this time. (*Id.* at 398–99). Hamill then saw White walk around the car that petitioner was leaning against and he saw petitioner reach inside his car and take out something metallic. (*Id.* at 399–400). Then, in an overhand fashion, petitioner stabbed White three times. (*Id.* at 400). Hamill rushed out of the Bar after grabbing a police night stick from the end of the bar. (*Id.* at 402–03). Petitioner began backing away from White; Hamill struck petitioner in the rib cage two, "maybe three," times. (*Id.* at 404–05). Petitioner continued to back away, got into his car and drove off. (*Id.* at 405–06). Hamill turned to White, who was stumbling backwards, and laid him on the ground. (*Id.* at 407). As described by Hamill, White had "a very bad neck injury, a very wide wound, and an injury to his arms, to his wrist." (*Id.*) Hamill tried to stop the bleeding with his hand and stayed with his friend, White, until the ambulance arrived. (*Id.* at 407–08).

Michael Knatz, Chief Financial Officer for a women's apparel chain in Queens, testified that he was a member of O'Hanlon's dart team during the summer of 1996 and was in the Bar on a Tuesday, practicing for a tournament. (*Id.* at 483, 486, 508). He described the people in the Bar, but did not know the names of the individuals sitting at the bar that evening. (*Id.* at 487–89, 509).

At approximately midnight, or 12:30 a.m., Knatz became aware of a commotion at the other end of the bar and heard "[f]oul language being screamed at by a customer" to the bartender. (*Id.* at 490, 512). The bartender asked the customer to leave and O'Hanlon escorted the customer out the door. (*Id.* at 491, 513). According to Knatz, the customer was physically forced out, "dragged completely across the floor" after a struggle with O'Hanlon and the bartender. (*Id.* at 491–92, 513–14, 515–17, 520–22).

After the customer was forced out the door, Knatz saw a wallet and a sneaker on the floor. (*Id.* at 494). O'Hanlon picked up the sneaker and threw it out the door and then relocked the door. (*Id.* at 495, 525–26). Knatz picked up the wallet off

the floor and gave it to O'Hanlon. (*Id.* at 496, 525–26).

Knatz then observed the customer who had been thrown out of the bar in his car, trying "to ram the front door of the bar." (*Id.* at 496, 530–33). Knatz observed Shannon on the phone, but could not hear what was being said. (*Id.* at 498, 527).[5] A little while later, Knatz observed another person who had been inside the bar earlier, standing on the curb, facing the other customer who had been thrown out. (*Id.* at 498–99, 534). Knatz then observed the person who had been evicted striking the other individual three or four times. (*Id.* at 500–01, 535–36). One of the other customers in the Bar then ran out to help his friend. (*Id.* at 507, 528). The individual being struck then fell to the ground and the attacker drove away. (*Id.* at 503–04).

Police Officer John Reilly, a member of the NYPD for more than eleven and a half years, testified that on August 13, 1996, he was assigned to car patrol with Officer John Mendola, when they received a radio call sometime after 1:00 a.m. (*Id.* at 538–41). They proceeded to O'Hanlon's Bar, arriving there at approximately 1:18 or 1:19 a.m., two minutes after receiving the radio call. (*Id.* at 542). When they arrived, Officer Reilly observed a male lying face up on the sidewalk outside the Bar, "bleeding profusely." (*Id.* at 543). Approximately one minute later, an ambulance arrived to transport the victim to Jamaica Hospital. (*Id.* at 544). Officer Reilly went to the Hospital in a second ambulance where he stayed for a little over an hour, returning thereafter to O'Hanlon's. (*Id.* at 544–45). Later, he returned to Jamaica Hospital to recover

Mr. White's clothing which he then vouchered, along with a wallet, some computer disks, and some pieces of paper given to him at the scene. (*Id.* at 547–48, 550). Among the items in the wallet was a Florida driver's license, a J.C. Penny department store credit card, a Dime Savings bank card, a Colombia Federal Savings Bank card, and a Social Security card. (*Id.* at 559–61, 722 N.Y.S.2d 799, 745 N.E.2d 1022).

Officer Reilly subsequently went to the morgue where he observed the body of the individual he had seen earlier that day, Francis White. (*Id.* at 562, 722 N.Y.S.2d 799, 745 N.E.2d 1022).

Dr. Adalaid Charlot, a forensic pathologist, employed as a City Medical Examiner, testified that she performed the autopsy on Francis White on August 14, 1996. (*Id.* at 574–77). Based on her examination, she noted twelve sharp injuries to White's head, neck, torso, and extremities. (*Id.* at 582). One stab wound, approximately three and a half to four inches long, entered the left side of Mr. White's neck, causing an injury to one of the main arteries in his neck, and then entered his lung. (*Id.* at 588). She also described various injuries to Mr. White's arms and hands. (*Id.* at 607). She concluded that Mr. White died as a result of the multiple stab and "incised"[6] wounds to his body, with injuries to his lung and subclavian artery. (*Id.* at 620).

Petitioner called Detectives Richard Arbacas, Victoria Garcia, and Devora Sconiers, employed by the NYPD for over 24 years, 15 years, and 18 years, respectively. (*Id.* at 649–50, 669–70, 684–85). Detective Arbacas interviewed Thomas Shannon, the

---

**5.** On cross-examination, the witness explained that there were two 911 calls made but he did not know whether Tom Shannon or Sean O'Hanlon made the first call using a phone behind the bar. (*Id.* at 527).

**6.** That is, cut into with a sharp instrument.

bartender at O'Hanlon's, on April 13, 1996 at 7:15 a.m. (*Id.* at 653). Shannon told the detective during that interview that he "and three or four patrons" had to "forcibly escort [petitioner] from the Bar." (*Id.* at 652). The detective conceded that at the time, Shannon was "upset," "concerned" and "appeared tired." (*Id.* at 653–54).

Detective Garcia testified that she interviewed Michael Knatz at 5:00 a.m. on the morning of April 13, 1996 after the incident. (*Id.* at 670, 673). According to her report, Knatz told her that "Sean [and] some other people" tried to escort petitioner from the bar that morning. (*Id.* at 672). Knatz did not mention the names of anyone else other than "Tom." (*Id.* at 675).

Detective Sconiers testified that she interviewed Sean O'Hanlon after the incident and O'Hanlon indicated that he, the bartender, and two other patrons ejected petitioner from the bar. (*Id.* at 687). Detective Sconiers admitted that while the report she prepared mentioned the two other patrons, her notes did not reflect that information. (*Id.* at 692–93).

Petitioner Carr testified that he was 26 years old, lived with his parents, and had been previously convicted in May 1996 of attempted petit larceny of five, maybe seven, airbags. (*Id.* at 698–99). He testified that after finishing work at around 5:00 to 5:30 p.m., on the night before the incident, Monday, April 12, 1996, his friend Frank Gomez came to petitioner's house around 8:00 to 8:30 p.m. (*Id.* at 700–01). After approximately an hour to an hour and a half, petitioner and Gomez drove to the Tenth Street Lounge in Manhattan where petitioner claimed to have had two beers and two Lemon Drops. (*Id.* at 702). Between 12:15 and 12:30 a.m., the two drove to Kinkos in Queens because Gomez "had to make copies," although petitioner could

not recall what Gomez was copying. (*Id.* at 703).

While Gomez was in Kinkos, petitioner went next door to O'Hanlon's to get two beers. (*Id.*) According to petitioner, he asked the bartender for "two beers to go, please," denying that he ever used profanity in asking for the beers. (*Id.* at 705–06). When the bartender told petitioner he could not serve petitioner beers to go, petitioner asked him if he knew a place because petitioner was not familiar with the area. (*Id.* at 706–07). Petitioner claimed that the bartender told him about a Korean grocery store down the block, to which petitioner responded "thanks" and left the Bar. (*Id.* at 707). He then went to the Korean grocery store but they could not make change for a hundred dollar bill so petitioner returned to O'Hanlon's. (*Id.* at 708).

Petitioner testified that as he walked toward the bartender in O'Hanlon's, he passed on the other side of the three men who were sitting at the bar. (*Id.* at 709). He said to the bartender "break this and keep $5 for yourself," to which the bartender responded that he did not have change. (*Id.*) Petitioner admitted that he said to the bartender "oh, come on, why you giving me a fucking hard time." (*Id.*)

The next thing that happened according to petitioner was that Sean O'Hanlon walked over, "grabbed [petitioner] by the back of [his neck]" and said, "come here." (*Id.* at 710). Petitioner then pushed O'Hanlon with his elbow. (*Id.* at 711). Petitioner claimed that O'Hanlon then punched petitioner in the face and petitioner fell to the floor. (*Id.* at 712–13). According to petitioner, he was then kicked in the face and struck in the back with a "stick" by Shannon. (*Id.* at 715). He was then thrown out of the bar by "maybe two, three" people. (*Id.* at 716).

He got into his car and was driving away when he remembered his friend at Kinkos so he drove over there and told Gomez, "let's go." (*Id.* at 718). Gomez went back into Kinkos and petitioner returned to the car to wait for him. (*Id.*) At that point, petitioner realized that he did not have his wallet. (*Id.* at 718–19).

As he was sitting in his car, he saw two men walk out of the Bar. (*Id.* at 720). When he recognized the second one as someone who had been seated at the table drinking, petitioner got out of his car and asked him if he knew who had petitioner's wallet. (*Id.*) According to petitioner, the man "said fuck you, you ain't getting your wallet, troublemaker, da-da-da." (*Id.* at 720–21).

Petitioner denied that he banged on his car at any point. Rather, he claimed that the victim was "coming towards me," and he "punched me in my face." (*Id.* at 722). Petitioner then claims that they exchanged two or three punches each. (*Id.* at 722–23). Petitioner then saw a man coming out of the bar with a stick in his hand and as he was trying to get into the car, the victim grabbed him. (*Id.* at 723). Petitioner then reached into a compartment in the door of his car and pulled out a knife "[b]ecause I was scared." (*Id.* at 724). He then turned around and was "just swinging wildly just to get Mr. White off me." (*Id.* at 725). The other individual struck him with the stick. (*Id.* at 726). Petitioner claimed that he "blacked out because I got hit again with the stick and I was just swinging wildly because I had somebody holding me and the guy was hitting me with the stick." (*Id.* at 727). When he felt that nobody was holding him any longer, petitioner jumped into the car

and drove off. (*Id.*) He admitted that he threw away the knife. (*Id.*)

Petitioner did not claim that Francis White had "laid a finger" on him inside the bar. (*Id.* at 741). He conceded that White was unarmed, and he also admitted on cross examination that White stopped because petitioner asked White if he had the wallet. (*Id.* at 752, 757). Finally, petitioner admitted that after the "beating," he did not go to the police; he just drove home. (*Id.* at 766).

The prosecutor then asked petitioner if had gone to a motel at 4:00 a.m. after the incident. (*Id.* at 767). Counsel for petitioner objected and moved for a mistrial, explaining that this line of questions would force counsel to be a witness as to the surrender negotiations. (*Id.* at 768). The prosecution, on the other hand, argued that the State had no contact with counsel until September 23, 1996 and that the purpose of the question was to elicit the fact that petitioner registered in the hotel under an alias, which is probative of consciousness of guilt. (*Id.* at 768–69). The court initially ruled that the questions would be allowed (*id.* at 773), but ultimately, the court sustained the objection. Since there had been no answer to the question, the court denied the motion for a mistrial. (*Id.* at 775).

## DISCUSSION

### A. *Timeliness of Petition*

The petition is governed by the 1996 Antiterrorism and Effective Death Penalty Act ("AEDPA") 28 U.S.C. § 2254 (1994 Supp.1996),[7] which provides that a "1–year period of limitation shall apply to an application for a writ of *habeas corpus*

---

**7.** This case is governed by AEDPA because the petition was filed on October 16, 2001, after the effective date of the Act. *See Williams v. Taylor*, 529 U.S. 362, 402, 120 S.C,t. 1495, 146 L.Ed.2d 389 (2000); *see also Overton v. Newton*, 146 F.Supp.2d 267, 272 (E.D.N.Y.2001), *judgment rev'd on other grounds*, 295 F.3d 270 (2d Cir.2002).

by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). This limitation, absent certain exceptions which do not apply to this case, runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). A conviction is deemed final for purposes of the AEDPA when the defendant's time to seek *certiorari* before the United States Supreme Court has expired. *See Ross v. Artuz*, 150 F.3d 97, 98 (2d Cir.1998). Here, petitioner's direct appeal to the Appellate Division was denied on November 6, 2000, *see People v. Carr*, 277 A.D.2d 246, 716 N.Y.S.2d 59, and his application for leave to appeal to the Court of Appeals was denied on January 19, 2001. *People v. Carr*, 96 N.Y.2d 733, 745 N.E.2d 1022, 722 N.Y.S.2d 799. Under Rule 13 of the Rules of the United States Supreme Court, petitioner had ninety days thereafter, until April 19, 2001, to seek *certiorari*. Since his petition was filed on October 16, 2001, he was clearly within the one-year limit set by the AEDPA and therefore, his petition is timely filed.

**B.** *Exhaustion of Petitioner's Claims*

1. *Standards*

Before considering the merits of petitioner's claims, this Court must first determine if petitioner has exhausted all of his state remedies and whether federal *habeas* review is permissible. The State argues that petitioner has failed to exhaust these claims and thus is procedurally barred from pursuing these claims in this federal petition. Specifically, the State contends that petitioner failed to fairly alert the state appellate courts to the federal constitutional nature of his claims, advancing only state law arguments in support of these claims.

■ A petition for a writ of *habeas corpus* may not be granted unless all available state court remedies have been exhausted. *See* 28 U.S.C. § 2254(b)(1)(A); *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir.1994), *cert. denied*, 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995). This rule is based on principles of comity between state and federal courts, *see Picard v. Connor*, 404 U.S. at 275–76, 92 S.Ct. 509, and requires that the highest court of the state be given "the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights," *Coleman v. Thompson*, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), before a federal court may consider the merits of the petition. *See Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir.1990) *(per curiam )*. "To fulfill the exhaustion requirement, a petitioner must have presented the substance of his federal claims 'to the highest court of the pertinent state.'" *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994) (quoting *Pesina v. Johnson*, 913 F.2d at 54), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). " 'In order to have fairly presented his federal claim to the state courts[,] the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court.'" *Harmon v. People*, No. 97 CV 2539, 1999 WL 458171, at *2 (E.D.N.Y. June 25, 1999) (quoting *Daye v. Attorney Gen. of New York*, 696 F.2d 186, 191 (2d Cir.1982) *(en banc )*, *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984)).

■ Petitioner satisfies the exhaustion requirement if he has presented his claim to the appropriate state courts in accordance with state procedural requirements, and thereby "afford[ed] the state courts a meaningful opportunity to consider [the]

allegations of legal error." *Vasquez v. Hillery,* 474 U.S. 254, 257, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (internal citation omitted). Although some courts have insisted upon citation in the state pleadings to a specific clause of the Federal Constitution that is alleged to have been violated, the majority of courts have held that a claim may be "fairly present[ed] to the state courts ... without citing chapter and verse of the Constitution" if there is: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis [in factually similar circumstances], (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." *Daye v. Attorney Gen. of State of N.Y.,* 696 F.2d at 194; *accord Jones v. Vacco,* 126 F.3d 408, 413–14 (2d Cir.1997) (holding that "[c]it[ation to] a specific constitutional provision or rel[iance] on federal constitutional precedents alerts state courts of the nature of the claim"); *Williams v. Lord,* 996 F.2d 1481, 1483 (2d Cir.1993) (holding that "[a]lthough [petitioner] did not cite specific constitutional provisions in her [state court] brief ... she explicitly asserted her constitutional right to present a defense ... [and] cited a leading Supreme Court case in this area"), *cert. denied,* 510 U.S. 1120, 114 S.Ct. 1073, 127 L.Ed.2d 391 (1994).

■ The legal claims raised in the state courts must also be the "substantial equivalent" of the claims raised in the federal petition. *See Picard v. Connor,* 404 U.S. at 278, 92 S.Ct. 509; *accord Waterhouse v. Rodriguez,* 848 F.2d 375, 381 (2d Cir.1988) (noting that "[t]he legal theory relied upon in the federal court need not ... be identical to the legal theory presented to the state courts, provided that the essential factual allegations and the ultimate constitutional question raised in the federal petition were presented to the state courts"), *cert. denied,* 493 U.S. 1003, 110 S.Ct. 564, 107 L.Ed.2d 558 (1989). Once a federal claim has been properly presented to the state courts, the fact that the state court did not address the claim on the merits and rejected it on a state procedural ground, or did not actually rule on the claim either on substantive or procedural grounds, but had a fair opportunity to address the claim, does not render a claim unexhausted. *See, e.g., Coleman v. Thompson,* 501 U.S. at 731–32, 111 S.Ct. 2546; *Castille v. Peoples,* 489 U.S. 346, 350–51, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989).

■ There is a second, distinct issue that must be addressed in addition to the requirement that a prisoner exhaust state remedies prior to filing a *habeas* petition; that is the problem of waiver or procedural default. *See Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976). In analyzing whether a claim has been exhausted, the court "refers only to remedies still available at the time of the federal petition." *Engle v. Isaac,* 456 U.S. at 125 n. 28, 102 S.Ct. 1558. If there is currently available an avenue in the state courts for raising a claim, the federal court generally abstains from *habeas* review; "[c]onversely, of course, if no state procedure is available for raising any claims at the time a state prisoner applies for federal relief, the exhaustion requirement is satisfied." *O'Sullivan v. Boerckel,* 526 U.S. 838, 852, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) (Stevens, J. dissenting) (setting forth an explanation of the difference between the doctrine of exhaustion and procedural default, with which the majority expressly noted agreement).

## 2. Application

In examining each of petitioner's claims, it appears that he failed to assert any violation of his federal constitutional rights when he briefed his claims on appeal to the Appellate Division, nor did he cite any federal cases in his brief on appeal. Rather, his claims were based on New York State statutes and he relied solely on state law and state decisions. (*See* Pet'r. Br. on Appeal).

The only reference that could conceivably be seen as invoking federal constitutional principles are the use of the words "due process" and "fair trial" which appear in the headings to two of his claims in his appeal brief. Citation to a federal constitutional principle in a point heading of a brief before the state appeals court, without more, has been held to be insufficient for purposes of exhaustion. *See Gordon v. Kelly*, No. 89 CV 1907, 1989 WL 92043, at *2 (E.D.N.Y. Aug.7, 1989) (holding that references to the Constitution in the point heading were insufficient to exhaust constitutional claim); *see also Gonzalez v. Sullivan*, 934 F.2d 419, 423 (2d Cir.1991) (same); *Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir.1984) (noting that references to due process and denial of fair trial were not sufficient to alert state court of federal claims); *Kirksey v. Jones*, 673 F.2d 58, 60 (2d Cir.1982) (holding that the mere allegation of a denial of a fair trial was insufficient to alert the state courts to a federal constitutional claim).

The Second Circuit in *Gonzalez* stated: "to allow a petitioner to exhaust his remedies merely by alluding to the federal constitution, without providing the state court at least a minimal argument on its application, undercuts [the policy behind exhaustion]." *Gonzalez v. Sullivan*, 934 F.2d at 423. Although the court in *Gonzalez* did not decide the petition on these grounds, the court commented that

at a minimum, the petitioner has the "burden of supplying at least one federal case and fashioning a legal argument directed particularly to federal constitutional principles." *Id.* While the court in *Davis v. Strack*, 270 F.3d 111, 122 (2d Cir.2001), found that the petitioner's citation in his point heading to a specific constitutional provision— namely, "U.S. Const., Amend. XIV"— was sufficient to constitute exhaustion, here, petitioner made no such specific reference, simply using the words "due process" and "fair trial," which could refer simply to his state law rights.

Since petitioner failed to fairly alert the state court of the nature of his federal constitutional claims, these claims are not exhausted. *O'Sullivan v. Boerckel*, 526 U.S. at 845, 119 S.Ct. 1728 (holding that state prisoners must give the state courts "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"); *see also Pesina v. Johnson*, 913 F.2d at 54 (stating that "the exhaustion requirement mandates that federal claims be presented to the highest court of the pertinent state before a federal court may consider the petition"); *Orraca v. Walker*, 53 F.Supp.2d 605, 609 (S.D.N.Y. 1999); *Cowans v. Artuz*, 14 F.Supp.2d 503, 505 (S.D.N.Y.1998).

"[A] federal *habeas* court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." *Harris v. Reed*, 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *see also Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir.1991). Where a state procedural bar exists, the petitioner no longer has any " 'remedies available in the courts of the state' " within the meaning of Section 2254(b). *See Grey v. Hoke*, 933 F.2d at 120 (quoting 28 U.S.C. 2254(b)). It is well established that a state procedural

rule barring direct review suffices to bar federal *habeas* review absent a showing of cause and prejudice. *Wainwright v. Sykes,* 433 U.S. 72, 81, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *see also Levine v. Comm'r of Corr. Servs.,* 44 F.3d 121, 126 (2d Cir.1995), *aff'd,* 112 F.3d 504, 1996 WL 601418 (2d Cir.1996), *cert. denied,* 520 U.S. 1106, 117 S.Ct. 1112, 137 L.Ed.2d 313 (1997) (holding that a state procedural bar provides an adequate basis for denying a prisoner's *habeas* petition unless the petitioner can show " 'cause for the default and prejudice resulting therefrom' ") (quoting *Gonzalez v. Sullivan,* 934 F.2d 419, 421 (2d Cir.1991)). Thus, as a separate matter, the Court must inquire as to whether the petitioner has any remedies remaining in the state court to warrant dismissal of the petition without prejudice to allow exhaustion.

▇▇▇ With respect to petitioner's claims, the State contends that he has procedurally defaulted on these claims by failing to raise these "on-the-record" claims in his direct appeal. *See* N.Y.Crim. Proc. Law § 470.50. He cannot now seek leave to appeal and raise these issues because he has already made the one and only request for leave to appeal to which he is entitled under Section 500.10(a) of the New York Court Rules. *See People v. Bachert,* 69 N.Y.2d 593, 597, 516 N.Y.S.2d 623, 509 N.E.2d 318 (1987). Collateral review by the state courts is also barred due to Carr's failure to raise these federal constitutional claims on direct review. *See* N.Y.Crim. Proc. Law § 440.10(2)(c) (providing that where "sufficient facts appear on the record of the proceedings underly-

ing the judgment" to have allowed adequate review of the claim on appeal, "no such appellate review or determination" will be permitted if the defendant failed to raise the issue on appeal).

Moreover, Carr has neither asserted any cause for his failure to raise the federal aspects of his claims on direct appeal, nor has he set forth any resulting prejudice.[8] *See Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Carr has neither demonstrated that " 'the factual or legal basis for [his] claim[s] [were] not reasonably available to counsel,' or that 'some interference by officials' made compliance impracticable.' " *Amadeo v. Zant,* 486 U.S. 214, 222, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988) (quoting *Murray v. Carrier,* 477 U.S. at 488, 106 S.Ct. 2639). Nor has he made a claim that ineffective assistance of counsel was the reason behind his failure to raise his federal constitutional claims. *See Murray v. Carrier,* 477 U.S. at 488, 106 S.Ct. 2639.[9]

Since Carr failed to raise these claims on direct appeal and cannot pursue these claims on appeal in the future due to the state's procedural bar, his claims are considered exhausted, but procedurally barred from review on the merits by this Court. *See, e.g., Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997) (holding that petitioner's *habeas* claim was deemed exhausted and was procedurally defaulted and stating that such a claim "need not ... be presented to a state court if it is clear that the state court would hold the claim procedurally barred") (internal citations omitted).

---

**8.** Petitioner has made no attempt to show either cause or prejudice, simply arguing that he raised the substance of each of his federal constitutional challenges to the state court. (Petr's Reply Br. ¶¶ 4–5).

**9.** Even if petitioner were to now claim that trial counsel or appellate counsel were ineffective, those claims are not cognizable in this *habeas* proceeding unless they have been first presented to the state court and exhausted. *See Edwards v. Carpenter,* 529 U.S. 446, 452, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).

Petitioner has also failed to demonstrate that a "fundamental miscarriage of justice" will occur if this Court fails to consider his claims. *Coleman v. Thompson*, 501 U.S. at 750, 111 S.Ct. 2546; *see also Murray v. Carrier*, 477 U.S. at 496–97, 106 S.Ct. 2639. The Supreme Court has held that even where the petitioner is unable to show cause and prejudice, a federal court may review the petition under the "miscarriage of justice" exception if petitioner can credibly demonstrate "actual innocence" and show through "new reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence," *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)— that the constitutional violation has "probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. at 496, 106 S.Ct. 2639. Here, petitioner does not even claim actual innocence nor has he shown that a fundamental miscarriage of justice will occur.

Accordingly, this Court respectfully recommends that the petition be denied for failure to exhaust.

## C. *Merits Review*

### 1. *Standards*

Even if the Court were to determine that the claims here were exhausted, petitioner cannot succeed on the merits of his claims.

Under AEDPA, the authority of federal courts to grant writs of *habeas* corpus on the merits of claims filed by state court prisoners is limited unless it can be shown that: (1) the adjudication of a claim on the merits in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The Supreme Court, in *Williams v. Taylor*, 529 U.S. at 404–05, 120 S.Ct. 1495, indicated that the "contrary to" and "unreasonable application" clauses of Section 2254(d)(1) have independent meanings. Under the first prong, a state court decision is considered to be "contrary to" clearly established federal law where the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases". or if the state court "confronts a set of facts that are materially indistinguishable" from those considered by the Supreme Court, but nevertheless reaches a decision contrary to the Court's clearly established precedent. *Id.* at 405–06, 120 S.Ct. 1495; *accord Overton v. Newton*, 295 F.3d at 275; *Jones v. Stinson*, 229 F.3d 112, 119 (2d Cir.2000). The precedent which provides guidance in this analysis are " 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.' " *Overton v. Newton*, 295 F.3d at 275–76 (quoting *Williams v. Taylor*, 529 U.S. at 412, 120 S.Ct. 1495).

Under the "unreasonable application" prong of Section 2254(d)(1), a state court decision will be set aside if it involves an "unreasonable application" of the correct governing legal rule to the particular facts of the case. *Williams v. Taylor*, 529 U.S. at 407, 409, 120 S.Ct. 1495; *accord Overton v. Newton*, 295 F.3d at 275. In conducting this analysis, the appropriate inquiry is whether the decision was objectively unreasonable, not whether it was incorrect or erroneous. *Williams v. Taylor*, 529 U.S. at 410, 120 S.Ct. 1495. However, while "[s]ome increment of incorrectness beyond error is required [,] ... [that]

increment need not be great; otherwise, *habeas* relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000) (internal quotations omitted); *accord Durant v. Strack,* 151 F.Supp.2d 226, 234 (E.D.N.Y.2001). In *Overton,* the Second Circuit, in interpreting *Williams,* reaffirmed its view that "the standard to be applied 'falls somewhere between merely erroneous and unreasonable to all reasonable jurists.'" 295 F.3d at 277 (quoting *Jones v. Stinson,* 229 F.3d at 119). The court in *Overton* also acknowledged that "there has been considerable uncertainty as to how broadly or narrowly lower courts should construe principles defined by the Supreme Court in order to determine whether state courts have applied them reasonably." *Id.*

What is clear, however, is that in examining the state court's application of federal law under either of these prongs, the state court's determination of a factual issue is "presumed to be correct," 28 U.S.C. § 2254(e)(1); *Overton v. Newton,* 295 F.3d at 275, and the petitioner has the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Moreover, "a decision adjudicated on the merits in a state court and based on a *factual* determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) (citing 28 U.S.C. § 2254(d)(2)) (emphasis added). Where there are pure questions of fact at issue, Section 2254(d)(2) applies. *Id. See also Hall v. Washington,* 106 F.3d 742, 752 (7th Cir. 1997). All factual determinations by a state court are "presumed correct absent clear and convincing evidence to the con-

trary." *Miller–El v. Cockrell,* 123 S.Ct. 1041 (citing 28 U.S.C. § 2254(e)(1)).

## 2. *The Prosecutor's Cross Examination*

Petitioner contends that he suffered prejudice during the course of the prosecutor's cross-examination. Specifically, the prosecutor asked petitioner if he had gone to a motel at approximately 4:00 a.m. after the shooting incident. (Tr. at 767). Before petitioner responded to the question, petitioner's counsel objected, moved for a mistrial and asked for a sidebar conference at which counsel explained that by attempting to elicit evidence of petitioner's alleged flight following the incident, the prosecutor was forcing counsel to become a witness to his negotiations with the D.A.'s Office leading to petitioner's surrender. (Tr. at 768).

From a review of the record, it appears that the trial court originally was not only prepared to allow the prosecutor to inquire as to whether the petitioner had checked into a motel, but was also going to allow the prosecutor to elicit the fact that petitioner had registered under an assumed name. (*Id.* at 773). Eventually, after hearing further argument from the defense, the court sustained the objection and no answer was given. (*Id.* at 775). Petitioner contends that the prosecutor's misconduct and the trial court's denial of a mistrial at this point, without a further curative instruction, undermined petitioner's right to a fair trial.

With respect to the trial court's evidentiary ruling in this regard, petitioner has failed to establish that the trial court's ruling was contrary to well-settled Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Since "federal habeas corpus relief does not lie for errors of state law," *Lewis v. Jeffers,* 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990), and challenges to evidentiary rulings by a state

trial court ordinarily do not present federal constitutional issues, *see Crane v. Kentucky*, 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), petitioner's only avenue for obtaining review of this evidentiary ruling is to establish that the admission of the evidence in question was " 'so extremely unfair that its admission violate[d] fundamental conceptions of justice.' " *Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir.) (quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)), *cert. denied*, 525 U.S. 840, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998). The Second Circuit has defined evidence that is "so extremely unfair" as evidence that is " 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.' " *Id.* at 125 (quoting *Johnson v. Ross*, 955 F.2d 178, 181 (2d Cir. 1992)).

■■■■ Moreover, in order to obtain relief based on a claim of prosecutorial misconduct, the *habeas* petitioner must demonstrate that the "prosecutor [engaged in] ... egregious misconduct ... amount[ing] to a denial of constitutional due process." *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir.1990). In determining whether the alleged misconduct amounted to "prejudicial error," courts must review the conduct in the context of the entire trial. *See Strouse v. Leonardo*, 928 F.2d 548, 557 (2d Cir.1991). The court should examine not only "the severity of the misconduct" but also "the measures adopted to cure the misconduct, and the certainty of convictions absent the misconduct." *United States v. Friedman*, 909 F.2d 705, 709 (2d Cir.1990). Only if the conduct deprived the defendant of a fair trial does it violate due process. *Blissett v. Lefevre*, 924 F.2d 434, 440 (2d Cir.), *cert. denied*, 502 U.S. 852, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991).

■■ This single question, which was not answered, was not so material, nor "so extremely unfair" that there would have been reasonable doubt created in the jury's mind had the question never been asked. Even if the jury were to have speculated that petitioner's response to the question would have been in the affirmative had he been allowed to answer the question, and they then concluded that by checking into a motel, he was attempting to flee from authorities, there was evidence already before the jury that indicated that petitioner fled the scene immediately after the stabbing and disposed of the knife. (Tr. at 727, 766–67). Under these circumstances, this Court does not find that the prosecutor's question rises to the level of "egregious misconduct" that would amount to a denial of due process.

In summary, this Court finds that the state court's determination was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. *See Williams v. Taylor*, 529 U.S. at 434, 120 S.Ct. 1479.

### 3. Sufficiency of Evidence

Petitioner's second claim is that the evidence presented at trial was insufficient to sustain the jury's verdict and that the verdict was against the weight of the evidence. In response, the State argues that this Court is procedurally barred from reviewing the claim and that, in any event, there was more than sufficient evidence adduced at trial to support the verdict.

#### a) Procedural Bar

■■■ Under New York law, failure to comply with New York's contemporaneous objection rule constitutes a procedural default that bars state court review. New York Crim. Proc. Law § 470.05[2]. The State contends that petitioner failed to preserve his claim as to the legal sufficien-

cy of the evidence. Instead, the State notes that at the conclusion of the trial, petitioner moved to dismiss, arguing that the prosecution failed to prove a *prima facie* case. (Tr. at 646). At the close of the defense case, petitioner simply renewed his earlier motion, claiming a failure by the prosecutor to prove a *prima facie* case. (*Id.* at 776). In his appeal, he raised for the first time the claim that the evidence was not sufficient to disprove his defense of justification and he argued that the verdict was against the weight of the evidence. Petitioner's failure to specifically argue at trial that there was insufficient evidence to disprove his justification defense constitutes a procedural bar that prevents him from raising the issue on appeal. *See Dixon v. Miller,* 293 F.3d 74, 79–80 (2d Cir.2002) (citing *People v. Gray,* 86 N.Y.2d 10, 18–19, 652 N.E.2d 919, 920–21, 629 N.Y.S.2d 173, 174–75 (1995) and noting that "for an argument concerning the sufficiency of the evidence to be preserved, it must be 'specifically directed' at the alleged error"); *see also People v. Udzinski,* 146 A.D.2d 245, 541 N.Y.S.2d 9 (1989). By raising for the first time on appeal his claim as to the sufficiency of the evidence to disprove his defense, petitioner failed to preserve the claim. *See, e.g., People v. Udzinski,* 146 A.D.2d at 248, 541 N.Y.S.2d at 11–12; *People v. Bynum,* 523 N.Y.S.2d 492, 70 N.Y.2d 858, 859, 518 N.E.2d 4 (1987).

The State contends that this claim now raised by petitioner is not subject to federal *habeas* review because the Appellate Division, Second Department, the highest state court to rule on Carr's claims, relied on this procedural bar as an independent basis for denying this claim on appeal. (Resp. Mem. at 16–18). Specifically, in reviewing this claim, the Appellate Division stated: "The defendant's contention that the evidence was legally insufficient to disprove his defense of justification is un-

preserved for appellate review." *People v. Carr,* 277 A.D.2d at 247, 716 N.Y.S.2d at 60 (citing *People v. Cherry,* 275 A.D.2d 796, 714 N.Y.S.2d 221 (2000)).

Where, as here, the State Appellate Court has ruled that a procedural bar precludes review of a claim on appeal, this Court is barred from reviewing the claim in the context of a federal *habeas* petition unless petitioner demonstrates cause for his noncompliance with the rule and actual prejudice resulting therefrom. *Coleman v. Thompson,* 501 U.S. at 750, 111 S.Ct. 2546; *Teague v. Lane,* 489 U.S. at 298–99. The Supreme Court has held that where there has been a procedural waiver under state law that serves to bar the review of the petitioner's substantive claim in the state courts, that procedural bar is considered to be an independent and adequate state ground which bars consideration of the claim in a federal *habeas* petition. *Wainwright v. Sykes,* 433 U.S. at 87, 97 S.Ct. 2497. If a claim is procedurally defaulted in the state courts, a federal court may review the merits of the claim only if the petitioner can show "cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. at 749–50, 111 S.Ct. 2546 (internal citations and quotations omitted); *accord Wainwright v. Sykes,* 433 U.S. at 87–91, 97 S.Ct. 2497; *Levine v. Comm'r of Corr. Servs.,* 44 F.3d at 126; *Salahuddin v. Strack,* No. 97 CV 5789, 1998 WL 812648, at *5 (E.D.N.Y. Aug.12, 1998). To show cause, the petitioner must demonstrate "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule," *Murray v. Carrier,* 477 U.S. at 488, 106 S.Ct. 2639, and to establish prejudice, petitioner must show that the outcome of the case would have been different absent

the violation. *See Reed v. Ross*, 468 U.S. 1, 12, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984); *Salahuddin v. Strack*, 1998 WL 812648, at *5.

Again, petitioner has made no showing that there was some objective factor that caused petitioner's counsel not to comply with the state's procedural requirement. *Amadeo v. Zant*, 486 U.S. 214, 222, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). Nor has he demonstrated actual prejudice or a fundamental miscarriage of justice. Accordingly, petitioner's failure to follow the procedural rules and the appellate court's reliance on this procedural default constitutes an independent and adequate state ground that prevents federal *habeas* review.

#### b) *Merits*

Finally, a review of this claim makes it clear that the claim must nonetheless be denied on the merits.

In *Jackson v. Virginia*, 443 U.S. 307, 320–21, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court held that where a state prisoner raises a claim that there was insufficient evidence to support a finding of guilt beyond a reasonable doubt by a rational trier of fact, the prisoner has stated a claim cognizable in a federal *habeas corpus* proceeding, pursuant to 28 U.S.C. § 2254. The Court held that the critical inquiry was "whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt," *id.* at 318, 99 S.Ct. 2781, but instructed reviewing courts to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. 2781 (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972)).

■ The Second Circuit, in applying this standard of review, has admonished that "all possible inferences that may be drawn from the evidence must be construed in the prosecution's favor." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir.1996) (citing *United States v. Rosa*, 11 F.3d 315, 337 (2d Cir.1993), *cert. denied*, 511 U.S. 1042, 114 S.Ct. 1565, 128 L.Ed.2d 211 (1994)); *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir.1986). The Circuit has also noted that "assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues." *Maldonado v. Scully*, 86 F.3d at 35. "When faced with a record from which conflicting inferences may be drawn, the *habeas corpus* court must presume, even if the record does not show it affirmatively, that the trier of fact resolved the conflict in favor of the prosecution and must defer to that resolution." *Dixon v. Miller*, 56 F.Supp.2d 289, 295 (E.D.N.Y.1999) (citing *Wright v. West*, 505 U.S. 277, 297, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992)), *cert. denied*, 537 U.S. 955, 123 S.Ct. 426, 154 L.Ed.2d 305 (2002).

■ In this case, construing the evidence in the prosecution's favor, there was more than sufficient evidence for the jury to find guilt beyond a reasonable doubt. The State presented the testimony of four eyewitnesses to the incident, three of whom positively identified petitioner as the individual who attacked Francis White. (Tr. at 161–62, 299–300, 400). All four witnesses' testimony was consistent in describing petitioner's belligerent behavior when he first entered O'Hanlon's that evening (*id.* at 119, 274, 382, 490), described the struggle that ensued when the bartender refused to give him change, and testified that he was asked to leave the Bar. (*Id.* at 126–29, 285–87, 387–88, 491–

92). Moreover, none of the witnesses saw or heard Francis White become involved in petitioner's struggle with the owner and bartender, nor was there any evidence that White intervened in any way. (*Id.* at 141, 285, 387–88, 512, 518, 523). Indeed, even petitioner did not positively identify White as one of the individuals who "beat" petitioner. (*Id.* at 751–52).

Three of the witnesses testified that they watched petitioner attempt to drive his car into the front door of the Bar, and while there may have been discrepancies in the testimony over who actually made the phone calls to 911, and how many calls were made, the witnesses were clear that someone in the Bar called the police after petitioner tried to drive his car through the front door. (*Id.* at 149–50, 163, 293, 498). Finally, the witnesses all testified that they observed Francis White outside the Bar engaged in a conversation or argument with petitioner when petitioner reached into his car, pulled out an object, and then attacked White around the neck and head. (*Id.* at 158, 161, 297–300, 399–400, 500–02). Several of the witnesses described White's arms being raised in defense (*id.* at 165, 299), and the medical examiner's testimony confirms the existence of wounds on the victim's arms and hands that suggest that he was attempting to defend himself. (*Id.* at 602–03).

Although petitioner testified that he was acting in self-defense, the jury could, in light of all of the other evidence, choose to disbelieve petitioner's version of events and credit the testimony of the four other eyewitnesses. Petitioner's story at trial was that he was beaten up inside the Bar by at least three people and assaulted with a night stick. (*Id.* at 716, 726). He explained that he feared for his life when Charles Hamill later came after him again outside with the nightstick. (*Id.* at 712–716, 723–26, 739–42, 755–58). He testified

that he never meant to kill Francis White, who petitioner claimed was holding him down and preventing him from getting away; rather, petitioner was simply slashing wildly with the knife in an attempt to free himself from White. (*Id.* at 762–63). However, petitioner's testimony was contradicted in all critical respects by the prosecution's witnesses, who denied that anyone other than O'Hanlon struck petitioner during the struggle inside the bar, and who testified that White, who was unarmed, was attacked by petitioner and stabbed three times in the neck before Charles Hamill grabbed the night stick and ran out of the Bar in an effort to stop the attack. (*Id.* at 127–129, 139–41, 159–62, 164–67, 251, 253, 283–85, 297–300, 301–02, 353, 357, 359, 361, 388–89, 396–400, 400–04, 446–48, 451, 492–93, 500–02, 504).

Given the evidence presented in this case, and cognizant that the Court must defer to the jury's assessment of both the weight of the evidence and the credibility of the witnesses, this Court respectfully recommends that petitioner's second claim based on the sufficiency of the evidence be denied.

### 4. *Admission of the 911 Tapes*

Petitioner's final claim is that the trial court erred in admitting two 911 tapes into evidence, arguing that their admission constituted improper bolstering.

As noted above, challenges to a state court's ruling on evidentiary matters do not present a federal constitutional issue cognizable in a federal *habeas* claim. *See Crane v. Kentucky*, 476 U.S. at 689, 106 S.Ct. 2142. Even if the challenged testimony could be considered "bolstering" testimony that the trial court should have precluded, such an error does not constitute a violation of the Federal Constitution. *See Connolly v. Artuz*, No. 93 CV 4470, 1995 WL 561343, at *7–8 (E.D.N.Y.

Sept.15, 1995). Indeed, not only do the Federal Rules of Evidence permit "bolstering" testimony, *see* Fed.R.Evid. 801(d)(1)(C), but "[i]t is settled law that '[t]he concept of "bolstering" has no place as an issue in criminal jurisprudence based on the United States Constitution.'" *Best v. Superintendent of Clinton Corr. Facility,* No. 89 CV 3407, 1990 WL 164673, at *6 (E.D.N.Y. Oct.19, 1990) (quoting *Snow v. Reid,* 619 F.Supp. 579, 582 (S.D.N.Y. 1985)); *see also Walker v. Scully,* No. 90 CV 3328, 1992 WL 220002, at *10 (E.D.N.Y. Aug.25, 1992) (holding that "[t]his Circuit has never regarded the practice of bolstering as inimical to trial fairness" (citations omitted)). At best, the claim arises under a New York State policy or rule, *see Best v. Superintendent of Clinton Corr. Facility,* 1990 WL 164673, at *6 (citing *People v. Trowbridge,* 305 N.Y. 471, 113 N.E.2d 841 (1953)), and accordingly, is not cognizable in this federal petition.

■ Moreover, a review of the challenged evidence suggests no reason to believe that the trial court's ruling admitting the evidence was improper.[10] The first 911 call was made by Mr. O'Hanlon as he watched petitioner driving his car in front of the bar, trying to mount the sidewalk. Since his call was made contemporaneously with the events as they were unfolding and were corroborated by the observations of two other witnesses, Shannon and Knatz, the 911 tape was properly admitted as a "spontaneous description[ ] of events made substantially contemporaneously with the observations ... [and] sufficiently corroborated by other evidence." *People v. Brown,* 80 N.Y.2d 729, 734, 610 N.E.2d 369, 373, 594 N.Y.S.2d 696, 700 (1993) (finding the admission of two 911 tapes to

be in accordance with New York's present sense impression exception to the hearsay rule); *see also People v. Buie,* 86 N.Y.2d 501, 509, 658 N.E.2d 192, 197, 634 N.Y.S.2d 415, 420 (1995) (holding that the admission of a 911 tape that satisfied the requirements of the present sense impression exception was not improper bolstering where the witness was also available to testify).

■ Similarly, the second tape of the 911 call, again made by Mr. O'Hanlon as he watched petitioner attack White with a knife, was properly admitted as an excited utterance. As the Court of Appeals in *People v. Vasquez* explained, "[a]n excited utterance is one made 'under the immediate and uncontrolled domination of the senses, and during the brief period when consideration of self-interest could not have been brought fully to bear by reasoned reflection.'" 88 N.Y.2d 561, 579, 670 N.E.2d 1328, 1336–37, 647 N.Y.S.2d 697, 705–06 (1996) (quoting *People v. Brown,* 70 N.Y.2d at 518, 522 N.Y.S.2d 837, 517 N.E.2d 515).

Thus, as the Appellate Division, Second Department held in reviewing this claim on appeal, both 911 tapes were properly admitted under state law and did not constitute improper bolstering. *People v. Carr,* 277 A.D.2d at 247, 716 N.Y.S.2d 59. The court's holding is not only consistent with the Federal Rules of Evidence, but it clearly provides no basis under AEDPA for *habeas* relief.

Accordingly, it is respectfully recommended that petitioner's third claim be denied.

---

10. It should also be noted that petitioner did not object to the admission of the 911 calls when they were first offered into evidence during the trial (Tr. at 150–51), nor did he raise an objection when the prosecutor later offered a copy of the tape that had been redacted to eliminate all calls except the two relevant to the case. (*Id.* at 480).

*CONCLUSION*

For the reasons set forth above, it is respectfully recommended that the petition be denied in its entirety.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

**SO ORDERED.**